LEO D. PLOTKIN, ESQ. (SBN 101893)
JOHN P. MERTENS (SBN 252762)
LEVY, SMALL & LALLAS
A Partnership Including Professional Corporations
815 Moraga Drive
Los Angeles, CA 90049
Telephone: (310) 471-3000
Facsimile: (310) 471-7990
Email: lplotkin@lsl-la.com;
jmertens@lsl.-la.com

Attorneys for Plaintiff
PNC Bank, National Association,
successor by merger to National
City Bank

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| PNC BANK, NATIONAL ASSOCIATION, a national banking association, successor by merger to National City Bank,<br><br>Plaintiff<br><br>vs.<br><br>BRADY D. BUNTE, an individual,<br><br>Defendant. | Case No. 8:11-cv-00737-JST-RNB<br><br>**DECLARATION OF JAMES W. CLEMENTS IN SUPPORT OF PLAINTIFF PNC BANK, NATIONAL ASSOCIATION'S APPLICATION FOR RIGHT TO ATTACH ORDER AND ORDER FOR ISSUANCE OF WRIT OF ATTACHMENT AGAINST DEFENDANT BRADY D. BUNTE**<br><br>Date: November 21, 2011<br>Time: 10:00 a.m.<br>Courtroom: 10A<br><br>Honorable Josephine Staton Tucker, United States District Judge |

I, JAMES W. CLEMENTS, declare as follows:

1.  I am a Vice President of PNC Bank, National Association, successor by merger to National City Bank ("PNC" and in some instances, "Bank"), the plaintiff in the above-captioned action. I have personal, first-hand knowledge of the entire contents of this declaration and, if called upon to do so, could and would testify competently thereto.

### A. PNC's Business Records

2.  PNC provides various types of asset-based financing, including but not limited to mortgage warehouse loans, to its borrowers and clients. PNC is the successor by merger to National City Bank ("National City"), by merger dated on or about December 31, 2008.

3.  I began to be involved in the administration of the financing relationship between PNC, on the one hand, and Trust One Mortgage Corporation ("Trust One" or "Borrower"), on the other hand, in August of 2010, which involvement has continued through National City's merger into PNC to the present date. I was employed with National City when that entity merged with PNC.

4.  I am one of the custodians of the books, records and files of PNC, and was one of the custodians of the books, records and files of National City, as those books, records and files pertain to transactions between PNC or National City and Borrower, and between PNC or National City and the guarantor of Borrower's obligations to PNC, defendant Brady D. Bunte ("Bunte" or "Guarantor"). As to the following facts, I know them to be true of my own knowledge or I have gained knowledge from (a) the business records of PNC which were made at or about the time of the events recorded and maintained in the ordinary course of business of PNC at or near the time of the acts, conditions, or events to which they relate, and prepared in the ordinary course of business of PNC by a person employed by PNC or who had personal knowledge of the events being recorded and had a business duty to so accurately record such events, or (b) the business records of National

City which were made at or about the time of the events recorded and maintained in the ordinary course of business of National City at or near the time of the acts, conditions, or events to which they relate, and prepared in the ordinary course of business of National City by a person employed by National City who had personal knowledge of the events being recorded and had a business duty to so accurately record such events. I know from my prior experience with PNC and National City, including but not limited to with respect to financing relationships of PNC originally established or previously held in the name of National City, that these records are accurate and trustworthy.

5.   In my capacity as Vice President at PNC, and in my former capacities at National City, I have been required to and have become familiar with the manner in which PNC's documents, books, records and files are created and stored, and with the manner in which National City's documents, books, records and files were created and stored. Among other record keeping practices, the procedures in connection with the establishment of a financing relationship are and were as follows: after the original loan documents are signed by the lender and the borrower, all of the original documents (except any documents that PNC or National City might elect to record or file, such as a UCC-1 financing statement) are placed in a separate file, labeled and stored securely in PNC's or National City's offices. This occurs at or about the time that the original documents are delivered to PNC or National City. As to any documents that PNC or National City elects to record or file, PNC or National City causes the original signed documents to be recorded or filed in the appropriate recorder's office or secretary of state's office at or about the time the original recordable or fileable documents are delivered by the borrower. Shortly after the recorded or filed documents are returned to PNC or National City, the recorded or filed originals are likewise put into a separate file identified to the particular financing relationship.

6. I have personally examined all of the original documents in PNC's files relating to the financing relationship between PNC and Borrower. I have caused copies to be made of certain of these original documents, and then compared the copies to the originals and observed that they are true copies. These copies are attached hereto as Exhibits "1" through "6" as set forth below.

**B.     The Warehousing Documents**

7. On or about December 10, 2007, PNC (then known as National City), on the one hand, and Trust One as Borrower and Bunte as Guarantor, on the other hand, entered into a written First Amended and Restated Warehousing Credit and Security Agreement (as amended or modified from time to time, the "Warehousing Agreement"). The Warehousing Agreement replaced, extended and renewed a written Warehousing Credit Agreement between National City's predecessor-in-interest, National City Bank of Kentucky, on the one hand, and Trust One, on the other hand, dated March 31, 2000, as amended or modified from time to time. Pursuant to the Warehousing Agreement, PNC agreed to make certain advances (the "Advances") to Trust One not to exceed $30,000,000 in the aggregate, and subject to the terms and conditions specified therein (the "Warehouse Line of Credit"), to be used by Trust One to make residential mortgage loans to its various borrowers (the "Mortgage Loans"), conditioned on, among other things, a guaranty by Bunte of Borrower's obligations to PNC. A true and correct copy of the Warehousing Agreement is attached hereto as Exhibit "1" and incorporated by reference as though set forth in full herein.

8. On or about December 10, 2007, in connection with the Warehouse Line of Credit established under the Warehousing Agreement, Trust One executed and delivered to PNC a written Amended and Restated Warehouse Promissory Note dated December 10, 2007 in the principal amount of $30,000,000 (as amended or modified from time to time, the "Note", and together with the Warehousing Agreement and all other documents executed by Borrower or Bank

pursuant thereto or in connection therewith, as amended or modified from time, the "Warehousing Documents"). A true and correct copy of the Note is attached hereto as Exhibit "2" and incorporated by reference as though set forth in full herein.

9. Subsequently, from time to time, PNC, on the one hand, and Trust One and Bunte, on the other hand, entered into written modifications to the Warehousing Agreement (the "Modifications" and each, a "Modification"), with respect to various provisions not at issue herein. To reflect each of the Modifications, Trust One made, executed and delivered to PNC an Amended and Restated Warehouse Promissory Note. By the Modifications, among other things, the maximum principal amount of the Warehouse Line of Credit was modified from time to time, and the maturity date of Borrower's obligations under the Loan Documents was extended from time to time.

10. Pursuant to the Sixth Modification to First Amended and Restated Warehousing Credit and Security Agreement made and entered into as of June 15, 2010 (the "Sixth Modification"), the maturity date of Borrower's obligations under the Warehousing Documents was extended to July 31, 2010, at which time the full amount of the outstanding principal balance of, and all accrued but unpaid interest on, the Note became due and payable. Pursuant to the Sixth Modification, Borrower executed and delivered to PNC a Sixth Amended and Restated Warehouse Promissory Note dated June 15, 2010 in the principal amount of $20,000,000 (the "Sixth Amended Note"). True and correct copies of the Sixth Modification and the Sixth Amended Note are attached hereto as Exhibits "3" and "4", respectively, and incorporated by reference as through set forth in full herein.

11. Pursuant to the Warehousing Documents, Trust One agreed, among other things, to pay all costs and expenses incurred by PNC in connection with the administration and enforcement of the Warehousing Agreement and collection of

the amounts due under the Warehousing Documents, including, without limitation, reasonable attorney's fees. (See Ex. "1", at §§ 8.6, 8.8.)

12. PNC has performed all of its obligations, if any, pursuant to the Warehousing Documents, except to the extent performance was waived, excused or discharged by reason of the conduct of Trust One and/or Bunte.

### C.  The Guaranty and Amended Guaranty

13. On or about January 14, 2008, in order to induce PNC (then known as National City) to extend or continue to extend credit to Trust One under the Warehousing Documents, Bunte executed and delivered a written Guaranty (Specific Debt) dated as of December 10, 2007 (the "Guaranty") to and for the benefit of PNC. A true and correct copy of the Guaranty is attached hereto as Exhibit "5" and incorporated by reference as though set forth in full herein.

14. On or about October 2, 2008, in connection with the First Modification to First Amended and Restated Warehousing Credit and Security Agreement (Specific Debt) made and entered into as of September 24, 2008, by which the maximum principal amount of the Warehouse Line of Credit was temporarily increased to $40,000,000, and in order to induce PNC to extend or continue to extend credit to Trust One under the Warehousing Documents, Bunte executed and delivered a written First Amended and Restated Guaranty dated as of September 24, 2008 (the "Amended Guaranty") to and for the benefit of PNC. A true and correct copy of the Amended Guaranty is attached hereto as Exhibit "6" and incorporated by reference as though set forth in full herein.

15. The Guaranty and Amended Guaranty (the "Guaranties") provide, among other things, that "[t]his Guaranty contains the entire guaranty agreement between Guarantor and Bank with respect to all Indebtedness arising hereunder, and may be in addition to other contracts of guaranty executed by the undersigned in favor of Bank." (See Exs. "5" & "6", at § 9.)

16. Pursuant to the Guaranties, Bunte absolutely and unconditionally guaranteed the prompt and punctual payment and performance of all obligations of Trust One under the Warehousing Documents, then existing or thereafter arising, contingent or absolute, whether arising at stated maturity, by acceleration or otherwise. (See Exs. "5" & "6", at § 1.) Moreover, Bunte agreed to pay PNC all costs, expenses and fees (including, without limitation, reasonable attorney's fees), accrued or incurred by PNC in endeavoring to collect the guaranteed debt and enforcing Bunte's guaranty obligations. (See Exs. "5" & "6", at § 1.)

17. In addition, pursuant to the Guaranties, Bunte agreed, among other things, that PNC may enforce Bunte's obligations thereunder without first resorting to Borrower, any collateral or security for guaranteed debt or any other remedy whatsoever. (See Exs. "5" & "6", at § 2.) Bunte also specifically waived, among other things, "any and all presentment, demand of payment, protest or notice of protest, notice of dishonor, notice of nonpayment or other default with respect to any obligation or liability covered hereunder, and all defenses in law or equity." (See Exs. "5" & "6", at § 3.)

18. PNC has performed all of its obligations, if any, pursuant to the Guaranty and Amended Guaranty, except to the extent performance was waived, excused or discharged by reason of the conduct of Bunte.

D. **The Defaults and Indebtedness**

19. Pursuant to Section 7.1(A) of the Warehousing Agreement, Trust One promised and agreed, among other things, to (a) pay all principal, interest, fees and other charges with respect to the Note as and when due and payable, (b) strictly observe and perform all covenants, agreements, terms, conditions and limitations contained in the Warehousing Documents, and (c) to do all things necessary to prevent any forfeiture or impairment of PNC's rights thereunder. (See Ex. "1", at § 7.1(A).)

20. Pursuant to Section 2.6(A) of the Warehousing Agreement,

"On the Termination Date, without necessity of notice or demand, the Company shall pay the Bank the full amount of the outstanding principal balance of, and all accrued but unpaid interest on, the Warehouse Note and all other Secured Obligations." (See Ex. "1", at § 2.6(A).)

21. Pursuant to the Section 1.1 of the Warehousing Agreement, "'<u>Termination Date</u>' shall mean the earlier of (i) the Maturity Date, or (ii) the date the Bank declares this Agreement terminated . . . ." (See Ex. "1", at § 1.1.)

22. As set forth above, pursuant to the Sixth Modification, the maturity date of Borrower's obligations under the Warehousing Documents was extended to July 31, 2010, at which time the full amount of the outstanding principal balance of, and all accrued but unpaid interest on, the Note became due and payable. (See Exs. "3"-"4".) No further extensions of the maturity date were granted by PNC. Therefore, on July 31, 2010, the full amount of the outstanding principal balance of, and all accrued but unpaid interest on, the Note and all other obligations under the Warehousing Documents became due and payable immediately.

23. Pursuant to Section 8.1 of the Warehousing Agreement, an event of default occurs if, among other things, Trust One fails to make any payment of principal, interest, fees or other amounts due and owing to PNC under the Warehousing Documents on or before the date due, and such failure continues for a period of ten (10) calendar days. (See Ex. "1", at § 8.1(B).)

24. Pursuant to Section 8.3 of the Warehousing Agreement, upon an event of default specified in Section 8.1(B), the principal of, and all interest on, the Note and all other liabilities under the Warehousing Documents shall become due and payable concurrently therewith without notice of presentment, protest, notice of default, notice of acceleration of or intention to accelerate or other notice of any kind, all of which Borrower thereby expressly waived, and PNC may exercise any

and all of the rights and remedies set forth in Section 8.3 and any other remedies provided in the Warehousing Documents. (See Ex. "1", at § 8.3.)

25. An event of default has occurred pursuant to Section 8.1(B) of the Warehousing Agreement in that Trust One has failed to pay PNC the full amount of the outstanding principal balance of, and all accrued but unpaid interest on, the Note and all other obligations under the Warehousing Documents, on or before the July 31, 2010 maturity date, and such failure has continued for a period of more than ten (10) calendar days (the "Default"). Accordingly, PNC may exercise any and all of the rights and remedies set forth in Section 8.3 of the Warehousing Agreement and any other remedies provided in the Warehousing Documents.

26. As of October 20, 2011, the total amount of the indebtedness due and owing to PNC by Trust One pursuant to the Warehousing Documents, and by Bunte pursuant to his guaranty obligations, including principal and interest accrued through October 20, 2011, and attorney's fees and expenses of collection and enforcement incurred through September 30, 2011, but excluding interest accruing after October 20, 2011, and attorney's fees and expenses of collection and enforcement incurred after September 30, 2011, is $12,340,465.61 (consisting of $11,949,810.35 in principal due as of October 20, 2011, $288,769.72 in interest accrued through October 20, 2011, $100,442.75 in attorney's fees and $1,442.79 in expenses of collection and enforcement incurred through September 30, 2011). The total indebtedness due and owing to PNC by Trust One and Bunte as Guarantor includes the foregoing sum of $12,340,465.61, plus interest accruing from and after October 20, 2011 at the rate of $1,242.56 per diem, attorney's fees and expenses of collection and enforcement incurred after September 30, 2011, and previously accrued and thereafter accruing late fees and other fees and charges due under the terms of the Warehousing Documents and Guaranties (collectively, the "Indebtedness").

27. As of the date hereof, Trust One and Bunte, and each of them, have failed to pay the Indebtedness, or any portion thereof, to PNC, in violation of their respective obligations to PNC.

### E. Bunte's Liability Arises from the Conduct of a Trade, Business or Profession

28. Bunte's liability to PNC arises from Bunte's involvement in Borrower's business. I am informed and believe that Bunte is now, and at all times during the existence of the financing relationship between Bank and Trust One was, the President, Secretary, Treasurer, a director and the principal shareholder of Borrower. During the periods of my responsibility for the administration of the financing relationship between Bank and Borrower, I am aware that Bunte was, and currently is, involved on a day-to-day basis in Borrower's business. Moreover, the Warehousing Agreement and all the Modifications thereto were executed by Bunte in his capacity as Borrower's President, with authority to make decisions on its behalf, including decisions related to the financing relationship with Bank, as well as in his capacity as Guarantor of Borrower's obligations thereunder.

29. The financing provided by PNC to Trust One was to be used by Borrower for its business needs (namely, to make the Mortgage Loans), and not to be used by Bunte for any personal, family or household purposes.

### F. Bunte's Obligations Are Not Secured by Real Property, the Property Sought to Be Attached Is Not Exempt, and PNC Seeks Attachment for a Proper Purpose

30. The obligations owing to PNC by Bunte are not secured by real property.

31. The property of Bunte that PNC seeks to attach is not exempt from attachment.

LEVY, SMALL & LALLAS
A PARTNERSHIP INCLUDING
PROFESSIONAL CORPORATIONS
815 MORAGA DRIVE
LOS ANGELES, CA 90049

32. PNC seeks attachment in this matter solely for the purpose of securing the amounts owing to PNC by Bunte as Guarantor of Trust's One's obligations to PNC under the Warehousing Documents.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on this 19th day of October, 2011, at Louisville, Kentucky.

_____
JAMES W. CLEMENTS

26826-3